NATHAN TOD YOUNG, Chief Deputy Nevada State Public Defender, Petitioner, v. THE NINTH JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA, IN AND FOR THE COUNTY OF DOUGLAS, and THE HONORABLE DAVID R. GAMBLE, DISTRICT JUDGE, Respondents.

No. 21658

September 30, 1991                    818 P.2d 844

[Rehearing denied December 23, 1991]

*Terri Steik Roeser,* State Public Defender, *Janet S. Bessemer,* Chief Appellate Deputy, Carson City, for Petitioner.

*Scott Doyle,* District Attorney, Douglas County, for Respondents.

*Frankie Sue Del Papa,* Attorney General, and *Brooke A. Neilsen,* Assistant Attorney General, Carson City, for Amicus Curiae Nevada Attorney General.

*David McElhinney,* Reno, and *Arthur B. LaFrance,* Portland, Oregon, for Amicus Curiae The National Legal Aid and Defender Association.

*Annabelle Whiting Hall,* Reno, and *Margery B. Koosed,* Akron, Ohio, for Amicus Curiae National Association of Criminal Defense Lawyers.

## OPINION

*Per Curiam:*

In this original writ proceeding, petitioner seeks relief from an order issued by the district court imposing sanctions in the amount of $250 on petitioner, a chief deputy public defender. Petitioner filed a pretrial motion to strike the State's request for the death penalty in a murder trial. Alleging that the death penalty was being sought by the district attorney for political reasons or as a result of a decision improperly accorded to the victim's husband, petitioner requests that the order imposing sanctions be vacated or declared unenforceable. The district court imposed sanctions after determining that no evidential support existed for petitioner's motion to strike. Despite our sensitivity to the necessary latitude defense counsel must have in representing criminal defendants, especially in capital cases, we conclude that the district court's discretion was properly exercised in the instant matter. We therefore reject petitioner's request.

### Background

At the time of the pretrial motions, Douglas County District Attorney Brent Kolvet, representing the State, was engaged in a vigorous campaign for re-election. Petitioner's client, John Alden Colwell, was charged with murder with the use of a deadly weapon, kidnapping, and robbery with the use of a deadly weapon. The murder of the petite 52-year-old real estate agent who answered a call to show a vacant house in California, and whose lifeless body was discovered thereafter in Nevada,

attracted widespread attention in the press. Petitioner attempted to establish that prosecutions handled personally by Mr. Kolvet were unusual outside of the political season.

In a pretrial maneuver, petitioner filed a motion to strike the State's notice of intent to seek the death penalty. In the alternative, the motion requested that Mr. Kolvet be disqualified. Included as an exhibit to the motion was one of Mr. Kolvet's election advertisements promising to "be tough on crime."

At the time of the defense motion, plea negotiations between prosecution and defense were nonexistent. Petitioner, and the office he represents, were apparently distressed that Colwell had not been offered plea negotiations since before the preliminary hearing.[1] In opposing the motion to strike, the district attorney asked the district court to sanction Mr. Young for attempting to embarrass the district attorney's office into settling the case. A deputy district attorney was present when petitioner and the district attorney discussed plea negotiations at a chance meeting at the Douglas County Judicial Building law library. The deputy district attorney submitted an affidavit averring that petitioner "threatened that unless Mr. Kolvet acquiesced in the offered negotiations," the motion to strike the notice to seek the death penalty would be filed.[2]

At the hearing on the motion, Mr. Young called several witnesses. Two justice court clerks testified that Mr. Kolvet appeared only for "real important, big cases." Public Defender Terri Steik Roeser testified for petitioner. Ms. Roeser testified that "what makes it political is the few number of cases [Mr. Kolvet personally undertook]. I don't have to run for office so I have no motivation to have my name in the paper, to take a

---

[1] This conclusion may be reasonably inferred from the hearing testimony of Terri Steik Roeser, Nevada State Public Defender.

[2] The U.S. Supreme Court has stated that a defendant does not have a constitutional right to plea bargain. Weatherford v. Bursey, 429 U.S. 545, 561 (1977). "Plea bargaining flows from 'the mutuality of advantage' to defendants and prosecution, each with his own reasons for wanting to avoid trial." Bordenkircher v. Hayes, 434 U.S. 357, 363 (1978) (quoting Brady v. United States, 397 U.S. 742, 752 (1970)), *reh'g denied,* 435 U.S. 918 (1978). Petitioner has attempted to draw a parallel between defense plea bargain tactics and the prosecutorial tactic of overcharging as a means of compromising an offense at an acceptable level. The not "uncommon practice" of overcharging such as where "the prosecutor files a felony charge which is supported by the evidence in the hope of inducing a plea to a misdemeanor when, as a matter of general prosecutive policy, the case would actually be tried only on a misdemeanor charge" is somewhat controversial. *See* 2 W. LaFave & J. Israel, Criminal Procedure § 20.3(c) (1984 & Supp. 1991). *Such an analogy may be misguided.* Although the U.S. Supreme Court has never held this practice unconstitutional, there is a division of opinion as to whether this charging practice is ethical and proper. *Bordenkircher,* 434 U.S. at 368 n.2 (Blackmun, J., dissenting).

certain position on a case.'' On cross-examination, Ms. Roeser stated, however, that she could not determine the extent to which information from the district attorney's office was voluntarily provided to the press or generated by inquiries emanating from the press itself.[3]

After the hearing, the district court promptly denied the defense motion, ruling that ''zero had been proven.'' The court also found that the motion was filed in bad faith and for an improper purpose. Sanctions were imposed against Mr. Young in the amount of $250, payable to the clerk of the court. Amici argue strenuously that sanctioning defense counsel would have a chilling effect on the death penalty bar.[4]

## Discussion

This court may exercise an independent judgment and review the record de novo when reviewing findings of a disciplinary nature. Gentile v. State Bar, 106 Nev. 60, 62, 787 P.2d 386, 387 (1990), *overruled on other grounds,* ...... U.S. ......, 111 S.Ct. 2720 (1991).

We agree with the district court that the power to sanction defense counsel in the instant case derived from the inherent powers of a trial court to control proceedings before it. It has been cogently stated that ''[a] trial judge is under a duty, in order to protect the integrity of the trial, to take prompt and affirmative action to stop . . . professional misconduct.'' United States v. Dinitz, 424 U.S. 600, 612 (1976) (Burger, C.J., concurring).

In the federal system, the inherent powers of the courts have been described as those which '''are necessary to the exercise of all others.''' Roadway Express, Inc. v. Piper, 447 U.S. 752, 764 (1980) (quoting United States v. Hudson, 7 Cranch 32, 34 (1812)). The Supreme Court has recognized the ''inherent power of a court to levy sanctions in response to abusive litigation practices.'' *Id.* at 765. ''The power of a court over members of its bar is at least as great as its authority over litigants.'' *Id.* at 766.

---

[3]One press clipping in the record on appeal reproduces a surveillance photograph taken of Colwell at an automatic teller machine when he attempted to access his victim's account. At this point, the police were legitimately trying to identify and locate an unknown suspect.

[4]We have found useful in our analysis the thorough amicus curiae brief in support of petitioner from the National Legal Aid and Defender Association, reflecting the research of Professor Arthur B. LaFrance and student counsel, James Clark, Nanci Klinger and Ann Palmer, of Lewis & Clark Law School; we also appreciated the amicus curiae brief of the National Association of Criminal Defense Lawyers.

Under the inherent power doctrine, Nevada courts have jurisdiction to impose sanctions on attorneys even in criminal cases. SCR 39;[5] SCR 99(2).[6] Because we have concluded that the inherent disciplinary authority of the district courts constitutes the proper jurisdictional basis for the imposition of sanctions in the instant case, we elect not to address the suggestion that NRCP 11 is applicable to criminal cases.

Having concluded that the district court possesses the inherent authority to impose sanctions against counsel on either side of the adversarial fence in criminal cases, we turn now to the substance of the record in reviewing the propriety of the sanctions imposed against Mr. Young. The record reflects no basis for concluding that the district attorney did not conscientiously follow the statutory guidelines for imposition of the death penalty as provided under NRS 200.030 and NRS 200.033.[7] Moreover, the allegation that the death penalty was filed at the behest of the victim's husband was credibly rebutted by Mr. Kolvet, who stated that it has been a consistent policy of his office to consult with victims and their survivors in assessing, along with other factors, a course of prosecution. The record does not support the accusation

---

[5]Supreme Court Rule No. 39 provides as follows:

Attorneys being court officers and essential aids in the administration of justice, the government of the legal profession is a judicial function. Authority to admit to practice and to discipline is inherent and exclusive in the courts. The supreme court rules set forth in this Part III are the exclusive rules for the governing of the legal profession in Nevada.

[6]Supreme Court Rule No. 99(2) provides:

Nothing contained in these rules denies any court the power to maintain control over proceedings conducted before it, such as the power of contempt, nor do these rules prohibit any association from censuring, suspending, or expelling its members.

[7]The State explained, and we agree, that there was a sufficient basis in fact in the record to file a notice requesting the death penalty under the statutory requirements of NRS 200.033(4), (5) and (6) which state:

4. The murder was committed while the person was engaged, alone or with others, in the commission of or an attempt to commit or flight after committing or attempting to commit, any robbery, sexual assault, arson in the first degree, burglary, invasion of the home or kidnaping in the first degree, and the person charged:

(a) Killed or attempted to kill the person murdered; or
(b) Knew or had reason to know that life would be taken or lethal force used.

5. The murder was committed to avoid or prevent a lawful arrest or to effect an escape from custody.

6. The murder was committed by a person, for himself or another, to receive money or any other thing of monetary value.

that there was improper deference to the husband's wishes without independent decision-making on the part of the prosecutor's office. *See* State v. McDonnell, 794 P.2d 780, 784 (Or. 1990).

After careful review of all aspects of the record before us, we cannot agree that petitioner established a prima facie case of improper political motivation. There is simply no credible basis for concluding that prosecutorial discretion resulted from improper motive or an unjustifiable and arbitrary classification. *See* Zant v. Stephens, 462 U.S. 862, 878-79 (1983).

The prosecutor's election rhetoric concerning a stance that is "tough on crime" is neither unethical nor surprising given a prosecutor's responsibility to enforce the criminal laws of the state. Standing alone, it is singularly insufficient to support an innuendo of politically motivated prosecution. Moreover, an important aspect of the over-all supervisory and administrative responsibilities of the public prosecutor is the official prerogative to decide which cases he or she will personally address or prosecute. Petitioner attempted to suggest an improper prosecutorial purpose by juxtaposition of inferences and attenuated circumstantial evidence. The effort was clearly insufficient as a matter of law. In order to establish a prima facie case of improper political purpose in requesting imposition of the death penalty, defense counsel must be prepared to offer substantial supportive evidence such as an actual statement to a third party.[8] Without a sufficient evidential foundation, such a charge is demeaning to the criminal justice system in general, and to the processing of capital cases in particular, as an already complex and extended procedure is further encumbered by delay attributable to groundless political accusations requiring time-consuming inquiries into collateral issues.

We are fully cognizant of the vigorous, diligent advocacy demanded of defense counsel in representing capital defendants in accordance with their sixth amendment, fundamental rights to a fair trial. *See* Strickland v. Washington, 466 U.S. 668, 684 (1984). Standard 4-1.2(c) of the ABA Standards for Criminal Justice (3rd ed. 1991), states:

> Since the death penalty differs from other criminal penalties in its finality, defense counsel in a capital case should respond to this difference by making extraordinary efforts on behalf of the accused.

---

[8]For the district court hearing, Mr. Young obtained affidavits from criminal defense attorneys around the country which stated in theory that an allegation of political motivation by the State in demanding the death penalty was proper.

Approved on Feb. 11, 1991, 49 Crim. L. Rep. (BNA) 2014. We are in complete accord with the quoted standard.

Moreover, we view with approval the court's description of an attorney's duty to defend his or her clients "fully, vigorously, and even with arguments which might be offensive or ultimately unsuccessful. This is particularly true in criminal cases, where the clients' liberties are at stake, and where the adequacy of the attorneys' representation can raise constitutional issues." In re Order to Show Cause, 741 F.Supp. 1379, 1381 (N.D.Cal. 1990). The U.S. Supreme Court has stated that "the adversarial process protected by the Sixth Amendment requires that the accused have 'counsel acting in the role of an advocate.'" United States v. Cronic, 466 U.S. 648, 656 (1984) (quoting Anders v. California, 386 U.S. 738, 743 (1967)).

Capital cases most often generate public opprobrium which may frequently extend to defense counsel, many of whom are appointed and modestly compensated for their efforts. Moreover, as noted by amici, often defense counsel's role in criminal cases "is differentiated from that in civil cases by the paucity of discovery." "Lawyers in criminal cases 'are necessities, not luxuries.'" Cronic, 466 U.S. at 653 (quoting Gideon v. Wainwright, 372 U.S. 335, 344 (1963)). Defense counsel assumes a vital role in the preservation of a constitutional system of criminal justice that guarantees fundamental fairness to defendants who stand in jeopardy of losing life, liberty or property. Courts must be vigilant in assuring that a defendant's right to effective counsel is not unduly circumscribed by judicial constraints that deny counsel ample latitude to fairly and effectively pursue and present the client's legal defenses. Indeed, the constitutional right of a criminal defendant to effective counsel is of such a magnitude that challenges to counsel's effectiveness has become a common issue both before the trial courts and on appeal. It would be injudicious to contend, however, that an accused's constitutional right to effective assistance of counsel has no limitations. Illustrative of the point is the holding in Nix v. Whiteside, 475 U.S. 157 (1986), that the sixth amendment right of a criminal defendant to effective assistance of counsel is not violated when an attorney refuses to cooperate with the defendant in presenting perjured testimony. Id. at 174-75. Nor is the right violated or attenuated by restricting defense counsel's latitude in impugning and maligning, without an evidentiary basis, a prosecutor's decision to seek the death penalty.

We are not persuaded that requiring prima facie evidence of a prosecutor's improper political purpose in seeking the death

penalty will impermissibly chill the high level of advocacy expected from the death penalty bar.[9] The evidentiary threshold for challenging a state prosecutor's motivation in requesting the death penalty must be more than intuition and tantalizing innuendo. Criminal defendants and their lawyers must abide by the rules that apply to other litigants. *See* Maness v. Meyers, 419 U.S. 449, 458-60 (1975). Capital defense does not insulate counsel from sanctions imposed for patently nonmeritorious motions.

[Headnote 9]

As a matter of sound judicial policy, we are unable to countenance delay occasioned by motions filed by capital counsel assigning, without prima facie evidence, improper political motives to state prosecutors who elect to seek the ultimate penalty. Nevada's attorney general and district attorneys are elected public officials who are part of the political process. It is unrealistic to expect that a degree of political consideration may not impact a prosecutor's decision concerning the prosecutorial course to follow in high profile cases. Moreover, we do not view political motivation per se as a legal basis for challenging the propriety of a prosecutor's determination to seek the death penalty against a criminal defendant. Of preeminent concern is whether the prosecutor has substantial evidence of aggravating circumstances that would qualify a defendant for capital status.

Although we have concluded that the instant record justifies the action taken by the district court in imposing sanctions against Mr. Young for interjecting groundless delay in a matter of substantial importance, we continue to expect that our trial judges will exercise circumspection in the imposition of such sanctions in death cases. Our concern over the prospect of chilling or unduly temporizing ethical representation by counsel will inevitably trigger a heightened appellate concern and scrutiny when a trial court imposes monetary sanctions on counsel for a client facing the death penalty.

For the reasons discussed above, petitioner's request for relief in the form of a writ of mandamus or prohibition is denied.[10]

---

[9]In the civil rule 11 context, such an effect has been a concern to legal commentators who "feared the rule would 'chill' vigorous advocacy especially in 'disfavored' lawsuits." Vairo, *Rule 11: A Critical Analysis,* 118 F.R.D. 189, 200 (1988). For example, statistics have shown "that there is a higher incidence of sanctioning in civil rights cases than would be warranted strictly on the basis of their percentage of the filings." Willging, The Rule 11 Sanctioning Process 161 (Fed. Jud. Center 1988).

[10]THE HONORABLE CHARLES E. SPRINGER, Justice, voluntarily recused himself from participation in the decision of this appeal.